**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION**

**JAVIER MEDRANO,** Plaintiff,

v.

**TESLA, INC.,** Defendant.

**Civil Action No.:** ________________

United States Courts
Southern District of Texas
FILED

JUL 27 2026

Nathan Ochsner, Clerk of Court

**JURY TRIAL DEMANDED**

**PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES**

## I. INTRODUCTION

1. This is a civil action for unlawful retaliation under the Motor Vehicle Safety Whistleblower Act (MAP-21), 49 U.S.C. § 30171. Plaintiff Javier Medrano brings this suit against Defendant Tesla, Inc. for his retaliatory termination after escalating severe, systemic safety oversight defects regarding Defendant's Full Self-Driving (FSD) Autonomous Vehicle (AV) testing operations on public Texas roadways. Specifically, Plaintiff blew the whistle on Defendant's intentional under-resourcing of its local human safety oversight architecture. By aggressively scaling its vehicle testing fleet and operator headcount across a continuous 24-hour, three-shift testing cycle, while enforcing a dangerous 38:1 operator-to-manager ratio upon Plaintiff as the sole local manager—in direct violation of Defendant's own mandated 15:1 safety baseline—Defendant compromised its local emergency response and incident management capabilities, converting unverified ADAS software and exhausted personnel into rolling hazards on public streets.

## II. JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (Federal Question) and 49 U.S.C. § 30171(b)(3)(E).

3. Plaintiff has fully exhausted his administrative remedies. Plaintiff filed a timely administrative complaint with the Occupational Safety and Health Administration (OSHA) on October 28, 2025. Following OSHA's preliminary findings, Plaintiff timely appealed, and the matter was docketed before the Office of Administrative Law Judges (OALJ Case No. 2026-MAP-00001) on February 10, 2026. More than 210 days have elapsed since the filing of the initial administrative complaint, and the Secretary of Labor has not issued a final decision. There is no showing of bad faith by Plaintiff. After providing the requisite 15-day advance notice of intent to remove to the OALJ on July 10, 2026, Plaintiff now exercises his statutory right to bring this action in United States District Court for *de novo* review pursuant to 49 U.S.C. § 30171(b)(3)(E).

4. Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to this claim occurred in Houston, Harris County, Texas.

## III. PARTIES

5. Plaintiff Javier Medrano is an individual residing in Friendswood, Texas. At all relevant times, Plaintiff was employed by Defendant as the sole operational manager of Defendant's Houston FSD testing market.

6. Defendant Tesla, Inc. is a corporation organized and existing under the laws of the State of ~~Delaware,~~ Texas J.M. with its principal place of business located in Austin, Texas. At all relevant

times, Defendant acted as a "motor vehicle manufacturer" as defined and regulated by 49 U.S.C. § 30171, operating a regional Full Self-Driving (FSD) autonomous vehicle testing hub in Houston, Texas.

## IV. FACTUAL ALLEGATIONS

7. **May 2024 (Safety Baselines & Operational Mandates):** In late May 2024, Autopilot Director Pete Scheutzow published the "Rodeo Team Update v2," which explicitly mandated that Leads allocate "80% data collection excellence, 20% people/operations management," work overlapping AM and PM shifts with weekend on-call availability, and maintain "60-80 hour work weeks on average."

8. Separately, on May 19, 2024 (8:13 PM), Autopilot Director Pete Scheutzow established the operational baseline metric for management in a written Mattermost communication, stating: "Hi Zaira - it's more based on driver count than location. We want a ratio of around 1 lead to 15 drivers. Enough for a complete SWAT team."

9. **August - October 2024 (Forced Scale-Up):** Director Scheutzow delayed Plaintiff's formal promotion until October 14, 2024. Subsequently, Defendant forced a progressive hiring ramp-up, actively scaling the Houston market up to 38 vehicle operators testing FSD technology on public roadways across a 24-hour daily testing cycle encompassing three continuous shifts (AM, PM, and Graveyard). Plaintiff was left to manage this alone, far exceeding the mandated 15:1 safety baseline.

10. **February 28, 2025 (Escalation of Safety Oversight Defect):** Defendant's internal mandates for Full Self-Driving (FSD) autonomous vehicle testing operations require local management to actively audit driving clips, conduct weekly ride-alongs, and manage safety incidents. However, Plaintiff had been left to manage the massive Houston

scale-up alone. Early in a lawfully recorded call on February 28, 2025, Director Scheutzow admitted to a systemic failure of his own managerial oversight, stating: "I think also we haven't had a lot of time together, like to talk about like management and expectations. This is the first real, like one on one, yeah."

11. During this same conversation, Director Scheutzow interrogated Plaintiff regarding steady-state data auditing, stating: "How many clips did you review too for data quality is where they how many of those were bad quality how many good quality. if they were bad quality, what are the types of bad quality issues that you're seeing and how are you fixing them? That's like, thats results you know?"

12. Plaintiff explicitly engaged in protected activity by notifying Director Scheutzow that the aggressively scaling operator-to-manager staffing ratio had caused a breakdown in safety oversight and extreme exhaustion, responding: "Yeah No, I haven't been doing any of that. So, yeah, I need to allocate some time to do that. But like, yeah, my schedule is pretty booked and I'm also trying not to lose my absolute mind, from not sleeping or eating correctly and doing everything I need to do to actually meet the expectations."

13. In response to Plaintiff's protected escalation regarding his physical exhaustion and the safety hazard, Director Scheutzow dismissed the warning, stating: "I don't get the impression that you're drowning." Scheutzow then criticized Plaintiff's operational updates regarding resource constraints, stating they were "much more wordy and verbose" and needed to be more "stats focused."

14. February 28, 2025 (Disciplinary Ultimatum): Rather than curing the severe understaffing defect, Director Scheutzow ended the February 28 call by issuing a disciplinary

ultimatum, stating: "If you get another two point five [performance score]. It means we put you on a pip."

15. **March 14, 2025 (Management Directives):** On March 14, 2025, Director Scheutzow posted an operational directive to an internal channel, stating: "This is on top of the admin tasks of the job (pto, performance, timecards, incidents etc). 90% data 10% admin." Director Scheutzow issued this mathematically impossible mandate while Plaintiff was exclusively managing the administrative overhead of a 38-person team alone.

16. **March 24, 2025 (Written Escalation):** Plaintiff formally requested time off in a direct Mattermost message to Pete Scheutzow due to extreme exhaustion, writing: "I'm looking to take some time off. It's straight up for me to take a physical/mental break and recharge. It never seems like the right time to ask, given the amount of pressure I've been under lately. I was hoping by now we would have another Lead. LMK how soon I could take some time off. I'm needing at least a week... This is officially my S.O.S signal."

17. **March 30, 2025 (Breakdown of Safety Oversight):** In autonomous vehicle testing on public roadways, remote fleet managers act as the critical human safety redundancy to manage hazards, emergencies, and post-collision protocols. By deliberately operating the Houston market at a highly dangerous 38:1 ratio, Defendant engineered a systemic breakdown of this mandatory safety architecture. The inevitable failure of this under-resourced safety structure occurred on Sunday, March 30, 2025.

18. **March 30, 2025 (Emergency Crash Response):** On Sunday, March 30, 2025, a graveyard-shift Tesla test operator was sideswiped by a third-party driver. As the sole manager responsible for a 38-person fleet operating across a continuous 24-hour,

three-shift cycle, Plaintiff received the emergency phone call from the operator. Telephone logs confirm the call occurred at exactly 2:05 a.m. and lasted 1 minute and 27 seconds.

19. Due to the severe biological exhaustion Plaintiff had formally escalated days prior, Plaintiff processed the phone call while physically asleep. Because Plaintiff was in a state of sleep-deprived cognitive incapacitation, he provided unsafe guidance to the operator—including laughing, which the operator later reported as sounding surprisingly "chill" and nonchalant. This inadvertently resulted in the operator remaining at the unsafe scene for an hour where she was approached by an allegedly impaired third party. This compromised emergency response was not a willful managerial error or negligence by Plaintiff; it was the direct, predictable symptom of Defendant's intentionally defective public-road safety protocols and extreme understaffing.

20. **March 31, 2025 (Verbal MAP-21 Escalation to HR):** On March 31, 2025, Plaintiff engaged in protected activity by formally escalating this safety breakdown to Human Resources Partner Briana Delgado. Plaintiff linked the safety failure to the workload on a lawfully recorded call, noting his incapacitation: "I have no recollection of that conversation at all. So I check my phone log. Sure enough, there is a call with her for a minute and 30 seconds at night." HR Partner Delgado stated she was categorizing this severe public-road safety incident under general "management concerns and conduct."

21. **April 2, 2025 (Confirmation of Employment Letter vs. Operational Directives):** Despite the May 2024 "Rodeo Team Update v2" mandating 60-80 hour work weeks, Defendant's Human Resources generated an official Confirmation of Employment letter

on April 2, 2025. This letter falsely classified Plaintiff as strictly "scheduled 40.00 hours weekly," contradicting the operational reality.

22. **April 13, 2025 (Written MAP-21 Escalation to Human Resources):** Recognizing the lack of action, Plaintiff engaged in protected activity by submitting a formal, time-stamped written escalation email to Human Resources (Briana Delgado, Marin Wenig, and Jennifer Veach). This email formally documented the ongoing extreme motor vehicle local safety oversight hazard on Houston public roads, noting that the severe understaffing appeared "contrary to the Code of Business Ethics commitment to 'A Safe Place to Work,' where safety should not be compromised for production." The email explicitly tied the March 30 crash response failure to Plaintiff's exhaustion and the lack of leadership support.

23. **April 15, 2025 (Corporate Directive to Abandon Public Road Safety Protocols):** On a lawfully recorded call responding to the MAP-21 escalation, Senior HR Representative Veach did not investigate the motor vehicle safety defect. Instead, Veach explicitly instructed Plaintiff to circumvent the safety hazard by placing his phone on "Do Not Disturb" during active testing shifts. Plaintiff, adhering to strict safety protocols, flatly refused this directive to abandon the safety-critical dispatch post, stating: "Sure, I can just say I'm ignoring like two shifts, right? But they're still my responsibility."

24. When Representative Veach replied, "Well, you shouldn't ignore two shifts... But you can't be there twenty four seven, right?", Plaintiff placed Defendant on explicit notice regarding the systemic disparity and lack of resources, stating: "I have been asking for months... I'm so above the expected headcount. and I'm the only one out of all the cities... I have way more than that. Not only that, other cities have multiple leads per like

assigned per shift, I don't get that luxury... I don't know why I'm being treated differently."

25. During this same April 15 call, Plaintiff requested the status of the investigation that was solicited in the April 13, 2025 email, where he explicitly wrote "I request a prompt, thorough, and impartial investigation into these matters…" Representative Veach replied regarding the investigation: "Javier, an investigation is not going to happen overnight... It's not going to happen in twenty four hours forty eight hours."

26. **April 17, 2025 (Escalation of Management Misclassification to Senior HR Jennifer Veach):** Plaintiff reiterated the safety hazards on a lawfully recorded call with Senior HR Representative Jennifer Veach. During this conversation, Plaintiff formally engaged in a deep dive regarding his discovery that Defendant had covertly coded him as an "M1 Supervisor" in backend systems. Plaintiff noted that Defendant had never provided formal transition documentation regarding his promotion from an hourly "S3" level to an exempt "M1" manager, while outwardly restricting him to a "Lead" title. Plaintiff raised this issue to demonstrate that Defendant was deliberately suppressing his wages and withholding the formal managerial authority and resources required to safely adhere to the 15:1 safety ratio.

27. **April 17, 2025 (HR Investigation Methodology and Refusal to Disclose Findings):** During this same call on April 17, 2025, instead of documenting the escalated safety failures in Defendant's digital tracking systems, Veach explicitly stated: "I'm sorry, I'm going a bit old school with pencil and paper, [and] my phone because, of course, this morning my computer chooses to do its force restart." Veach also questioned Plaintiff, stating: "So, do you feel like, you know, like I am or others are trying to like catch you in

doing something wrong?" Furthermore, Representative Veach explicitly informed Plaintiff that HR would not disclose the details, findings, or resolution of the investigation to him, though she did explicitly promise to notify him when the investigation was completed.

28. **Late April 2025 (Applicant Tracking System Requisition and Title Discrepancy):** Prior to his termination, Plaintiff had personally trained and advocated for the promotion of his subordinate, Javier Duarte. After raising his misclassification concerns with Human Resources, Plaintiff observed that Defendant had altered the ATS requisition link previously sent to Duarte. While the original web address URL Plaintiff sent Duarte still retained the "Lead" designation, the active webpage preview had been retroactively changed to display an upgraded "Supervisor" title. Upon information and belief, Duarte was offered a base salary significantly higher than Plaintiff's, confirming Defendant possessed the managerial resources and titles Plaintiff had repeatedly requested, but withheld them until after his termination.

29. **May 1, 2025 (Retaliatory Termination During Active Safety Investigation):** Exactly 18 days after Plaintiff submitted his timestamped written MAP-21 safety complaint—and crucially, while the formal Human Resources safety investigation initiated into his complaints remained actively open, pending, and unresolved—Defendant executed a retaliatory termination. This termination was strategically timed approximately one week before Plaintiff's next unvested equity award was scheduled to vest on or about May 6, 2025. By firing Plaintiff before concluding the inquiry, Defendant deliberately bypassed its own compliance protocols to silence a safety whistleblower and intentionally deprive him of his earned compensation.

30. In a shocking, recorded admission of motive, Director Scheutzow explicitly cited Plaintiff's protected safety escalations with Human Resources as the primary catalyst for the termination. Scheutzow stated verbatim: "I asked Brianna [HR] to join, mostly because I think some of the offline conversations you guys have been having with Bri and with Jen [Veach]... our decision here is final." By citing these specific safety-related human resources escalations as the reason for his decision, Defendant's Director explicitly linked the termination directly to Plaintiff's protected MAP-21 whistleblowing activities.

31. On the termination call, Scheutzow claimed Plaintiff had failed to submit safety audits, stating: "And every lead on a team has been contributing performance, ride along ratings to the team. And I look at your profile and there's not a single one." Utilizing a live screen-share, Plaintiff displayed his completed reports to Scheutzow. Upon viewing the documented data on the live screen-share, Scheutzow asked: "Are these 11 [submissions]?" Plaintiff confirmed, stating, "Yes. You said I had zero, right?" Scheutzow then proceeded with the termination despite Plaintiff explicitly disproving the stated metric.

32. **May 2025 (Post-Termination Resource Deployment & Seizure of Equity):** Director Scheutzow cited Plaintiff's failure to "delegate some of the challenges" as a reason for termination. However, immediately following Plaintiff's termination, Plaintiff was informed via a lawfully recorded phone call with a current Houston operator at the time, that Director Scheutzow announced to the Houston team that Plaintiff was being officially replaced by Javier Duarte. Furthermore, Director Scheutzow announced that two additional Dallas-based Leads were being flown to Houston to simultaneously

manage the market and train Duarte. Immediately following Plaintiff's termination, Defendant deployed the exact resources to the Houston market that Plaintiff had previously requested. Following the termination, Defendant canceled Plaintiff's unvested equity awards.

## V. CAUSES OF ACTION

### COUNT I: Retaliation in Violation of MAP-21 (49 U.S.C. § 30171)

33. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.
34. Plaintiff engaged in protected activity under 49 U.S.C. § 30171 by formally notifying Defendant's Autopilot Director and Human Resources of motor vehicle safety oversight defects, specifically the systemic failure of safety protocols caused by an intentionally unsafe 38:1 operator-to-manager staffing ratio.
35. Defendant knew of Plaintiff's protected activity.
36. Defendant took adverse employment action against Plaintiff by terminating his employment on May 1, 2025, and stripping him of unvested equity.
37. Plaintiff's protected activity was a contributing factor in the termination, as evidenced by the temporal proximity of the firing, the fabricated performance metrics used as pretext, and Defendant's explicit admission on a recorded call that the termination was linked to Plaintiff's escalations to Human Resources.

## VI. PRAYER FOR RELIEF

38. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant and award the following relief:

A. Reinstatement to Plaintiff's former position with the same seniority status;

B. Back pay, front pay, and lost benefits resulting from the termination;

C. Restitution for the canceled, unvested equity award;

D. Equitable relief and restitution for intentional wage suppression;

E. Compensatory damages for emotional distress, familial strain, and severe financial distress;

F. Punitive damages;

G. Costs of litigation, including reasonable attorney's fees; and

H. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 27th day of July, 2026.

Javier Medrano

**Javier Medrano, Plaintiff Pro Se**

3102 W Bay Area Blvd #1301

Friendswood, TX 77546

(281) 865-9173

jv.medrano93@gmail.com